UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Ira R. Deiches, Esq.
Deiches & Ferschmann
A Professional Corporation
25 Wilkins Avenue
Haddonfield, NJ 08033
(856)428-9696
Proposed Attorneys for Debtor
and Debtor-in-Possession

Case No.  18-32139

Chapter 11

In the Matter of:

JAMES CANDY COMPANY,

Judge: Hon. Andrew B. Altenburg, Jr.

Hearing Date:  December 11, 2018

Debtor and Debtor-in-Possession.

## CERTIFICATION IN SUPPORT OF DEBTOR'S MOTION FOR AN ORDER APPROVING AGREEMENT AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. §363(c)(2)

FRANK GLASER, of full age, hereby certifies that:

1.     I am the President of James Candy Company, Debtor and Debtor-in-Possession herein ("Debtor"), and make this Certification in support of Debtor's Motion for an Order approving Debtor's agreement with OceanFirst Bank, N.A. f/k/a OceanFirst Bank, successor by merger to Cape Bank ("OceanFirst"), authorizing Debtor's use of cash collateral pursuant to 11 U.S.C. §363(c)(2) (the "Motion").

### BACKGROUND

2.     On November 7, 2018 (the "Petition Date"), Debtor filed its Petition for Relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code").

3.     Debtor is operating its business and managing its property as Debtor-in-Possession pursuant to 11 U.S.C. §§1107(a) and 1108.

4.     No trustee or examiner has been appointed in this case.  No official committee of unsecured creditors has been appointed in this case.

5.   Debtor operates its retail candy business from multiple locations in Atlantic, Burlington, Camden, and Cape May counties in New Jersey, with its principal place of business at 1519 Boardwalk, Atlantic City, New Jersey (the "Premises").

6.   Debtor commenced this case to obtain relief from its lease obligations in respect of certain unprofitable retail locations and from significant unsecured trade debt and, with restructuring, to afford Debtor the opportunity to submit a Plan of Reorganization with respect to all of its creditors.

7.   This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§157 and 1334. The venue of this case and the within Motion is proper pursuant to 28 U.S.C. §§1408 and 1409. The statutory predicates for the relief sought herein are §§361, 363(b) and 364(c) and (d) of the Bankruptcy Code.

8.   Debtor's primary assets of value are the Premises and its inventory, accounts receivable, and cash, subject to a perfected security interest of record.

9.   The first priority lien is held by OceanFirst, by virtue of liens and security interests given to Cape Bank, and under which there is due the approximate principal sum of $2,886,112.17, together with accrued interest, fees and costs.

10.   Certain items of Debtor's equipment, and a 2014 Mercedes Benz, are or may be encumbered by Marlin Business Bank ("Marlin") and Mercedes Benz Financial Services ("MBFS"), respectively, by virtue of liens and security interests given to those entities.

11.   As of the Petition Date, Debtor was indebted to OceanFirst under two (2) obligations (the "Pre-Petition Loans") made on March 19, 2009, in the original amounts of $5,364,000.00 and $750,000.00 ("Loan #1" and "Loan #2"). As of the Petition Date, Debtor was obligated to OceanFirst under the Pre-Petition Loans in the approximate principal sums of $2,147,110.47 and $739,001.70, respectively. (Copies of the loan documents reflecting the Pre-Petition Loans have been filed with the Court as Exhibit "A" to this Certification. The loan documents have not been attached to the copies of this pleading served by mail to creditors and parties-in-interest for brevity, but can be provided to those creditors and parties-in-interest upon request.)

12.   To secure its obligations to Cape Bank under the Pre-Petition Loans, Debtor entered into a security agreement dated March 19, 2009, granting the lender a security interest in all of Debtor's assets including, but not limited to, Debtor's inventory, equipment, accounts, and the proceeds of the foregoing (the "Collateral").

2

13.   Prior to the Petition Date, Cape Bank,  perfected its interest in the Collateral by filing one or more UCC financing statements with the State of New Jersey.

14.   As of the Petition Date, Debtor had cash and bank deposits approximating $16,048.44, inventory approximating $227,734.52, and accounts receivable approximating $30,438.00.

15.   An immediate need exists for Debtor to obtain funds in order to continue its operations as Debtor-in-Possession.  Without such funds, Debtor will be unable to meet its operating expenses.  A copy of Debtor's projected budget through the end of December, 2019, is annexed hereto as Exhibit "B."

16.   Absent entry of an Order granting the Motion, Debtor will be unable to continue its business and Debtor's estate will be irreparably harmed.  Among other things, entry of the Order sought by the Motion will maximize the value of Debtor's assets through Debtor's going concern, and will promote the best interests of Debtor, its creditors and its estate.

17.   Debtor does not have sufficient unencumbered cash or other assets with which to continue to operate its business.  Debtor requires authority to use cash collateral as defined herein in order to continue its business operations without interruption, toward the objective of formulating an effective Plan of Reorganization.  Debtor's use of cash collateral to the extent and on the terms set forth herein is necessary to avoid immediate and irreparable harm to Debtor, its estate, its creditors and its employees, pending further hearing.  The amount of cash collateral authorized to be used pending further hearing or entry of a further Order shall be limited, through the date of a final hearing on the Motion to be scheduled by the Court, to the amount set forth in Debtor's budget annexed hereto up to a variance of five (5%) percent as to any line item, provided the aggregate expenditures do not exceed one hundred five (105%) percent of the aggregate of the budgeted expenditures for any calendar month.

## RELIEF REQUESTED

18.   By the Motion, Debtor seeks approval of its agreement to use OceanFirst's cash collateral pursuant to 11 U.S.C. §§361 and 363.

19.   As noted above, Debtor's assets consist primarily of cash, accounts receivable owing to Debtor from its customers, Debtor's inventory and the fixtures and equipment used by Debtor in the operation of its business.

20.   An immediate need exists for Debtor to obtain and use funds in order to continue its

3

operations as Debtor-in-Possession. If Debtor does not obtain authorization to use cash collateral as requested, Debtor may be required to terminate operations, resulting in a substantial, detrimental and immediate effect causing irreparable and substantial harm to Debtor's estate, creditors and parties-in-interest.

21.  Prior to the Petition Date, Debtor requested and obtained OceanFirst's consent to Debtor's use of cash collateral as proposed; nevertheless, Debtor urges the appropriateness of the entry of the Order sought by the Motion.

22.  Debtor requests that it be permitted to use OceanFirst's cash collateral on an interim basis, until the Court can make a further determination at a subsequent hearing.

23.  Among other things, entry of the Order sought will maximize the value of Debtor's assets and will promote the best interests of Debtor, its creditors and the estate.

## BASIS FOR RELIEF

24.  §363 of the Bankruptcy Code defines cash collateral as:

> . . . cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in Section 552(b) of this title, whether existing before or after the commencement of a case under this title.

25.  Debtor's cash, accounts, and the proceeds generated by the use of Debtor's inventory constitute OceanFirst's cash collateral.

26.  OceanFirst has consented to Debtor's use of OceanFirst's cash collateral and, through the entry of the Order sought by the Motion, Debtor proposes to provide OceanFirst with adequate protection.

27.  As adequate protection for Debtor's use of OceanFirst's cash collateral, Debtor proposes to grant OceanFirst a replacement lien on all of Debtor's unencumbered post-Petition assets.

28.  The assets subject to the security interests of Marlin and MBFS will not produce or

generate cash collateral.  Other than contractual payments Debtor may make to those creditors, no relief to those creditors is provided in the requested Order.

29.  Pursuant to F.R.Bankr.P. 4001, Debtor respectfully requests that it be authorized to provide notice of the final hearing on the Motion by serving copies of the Motion and accompanying Order upon: (i) the Office of the United States Trustee; (ii) counsel for OceanFirst; (iii) Debtor's other secured creditors; (iv) Debtor's twenty (20) largest unsecured creditors; and (v) all parties that have appeared in this case.

30.  I make this Certification in support of Debtor's request that the Court grant the Motion approving Debtor's agreement for the use of OceanFirst's cash collateral, and that the Court grant such other and further relief as is just and proper.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:   November 7, 2018

FRANK GLASER

# EXHIBIT A

OceanFirst Bank, N.A. successor by merger to Cape Bank

**PROMISSORY NOTE**

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $5,364,000.00 | 03-19-2009 | 04-01-2039 | 1088.12 | 80 | 1088 | FJG | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "* * *" has been omitted due to text length limitations.

| | | | |
|---|---|---|---|
| **Borrower:** | James Candy Company, a Corporation of the State of New Jersey<br>1519 Boardwalk<br>Atlantic City, NJ 08401 | **Lender:** | Cape Bank<br>Commercial Lending<br>225 N. Main Street<br>Cape May Court House, NJ 08210 |

---

**Principal Amount: $5,364,000.00**                                        **Date of Note: March 19, 2009**

**PROMISE TO PAY.** James Candy Company, a Corporation of the State of New Jersey ("Borrower") promises to pay to Cape Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Five Million Three Hundred Sixty-four Thousand & 00/100 Dollars ($5,364,000.00), together with interest on the unpaid principal balance from March 19, 2009, calculated as described in the "INTEREST CALCULATION METHOD" paragraph using an interest rate of 6.000% per annum based on a year of 360 days, until paid in full, together with all applicable fees and expenses. The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.

**PAYMENT.** Borrower will pay this loan in 360 payments of $32,463.47 each payment. Borrower's first payment is due May 1, 2009, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on April 1, 2039, and will be for all principal, accrued interest, and all other applicable fees and expenses, if any, not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note. (Initial Here _____ )

**PREPAYMENT PENALTY.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Upon prepayment of this Note, Lender is entitled to the following prepayment penalty: During the first five (5) years of the loan, if Borrower prepays more than twenty percent (20%) of the original principal amount of the Loan in excess of the annual scheduled principal and interest payments in any one (1) year of the mortgage (not cumulative), there shall be a prepayment penalty on that portion of the prepayment that exceeds twenty percent (20%) of the original principal amount of the Loan. Said prepayment penalty shall be paid by the Borrower to the Lender at the time of the prepayment.

In the event Borrower shall pay off this Loan from proceeds resulting in refinance from another financial institution, then Borrower shall be subject to payment of a premium on such prepaid amounts of three percent (3%) during the first (1st) and second (2nd) year of the Loan, two percent (2%) during the third (3rd) and fourth (4th) year of the Loan, and one percent (1%) during the fifth (5th) year of the Loan. Except for the foregoing, Borrower may pay all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Cape Bank, Commercial Lending, 225 N. Main Street, Cape May Court House, NJ 08210.

**LATE CHARGE.** If a payment is 15 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment. This late charge shall be paid to Lender by Borrower for the purpose of defraying the expense incident to the handling of the delinquent payment.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, at Lender's option, and if permitted by applicable law, Lender may add any unpaid accrued interest to principal and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased rate). Upon default, the interest rate on this Note shall be increased by 5.000 percentage points. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any loan.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Case 18-32139-ABA    Doc 3-1    Filed 11/08/18    Entered 11/08/18 18:15:50    Desc
Loan No: 1088,12
PROMISSORY NOTE
Certificate Page 8 of 51
(Continued)
Page 2

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of New Jersey without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of New Jersey.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Cape May County, State of New Jersey.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $15.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

(A) a Mortgage dated March 19, 2009, to Lender on real property described as "Real Property located at 1517-1519 Boardwalk, Block 50, Lot 29, Atlantic City, NJ  08401" and located in Atlantic County, State of New Jersey.

(B) an Assignment of Leases and Rents to Lender on real property described as "Real Property located at 1517-1519 Boardwalk, Block 50, Lot 29, Atlantic City, NJ  08401" and located in Atlantic County, State of New Jersey.

(C) a Mortgage dated March 19, 2009, to Lender on real property described as "Real Property located at 324-326 Washington Street, Block 1036, Lot 1, Cape May, NJ  08204" and located in Cape May County, State of New Jersey.

(D) an Assignment of Leases and Rents to Lender on real property described as "Real Property located at 324-326 Washington Street, Block 1036, Lot 1, Cape May, NJ  08204" and located in Cape May County, State of New Jersey.

(E) a Mortgage dated March 19, 2009, to Lender on real property described as "Real Property located at 904 Route 130, a/k/a Block 2201, Lot 15, Cinnaminson, NJ  08077" and located in Burlington County, State of New Jersey.

(F) an Assignment of Leases and Rents to Lender on real property described as "Real Property located at 904 Route 130, a/k/a Block 2201, Lot 15, Cinnaminson, NJ  08077" and located in Burlington County, State of New Jersey.

(G) a Mortgage dated March 19, 2009, to Lender on real property described as "Real Property located at 2325 Marlton Pike, Block 9.01, Lot 5, Cherry Hill, NJ  08034" and located in Camden County, State of New Jersey.

(H) an Assignment of Leases and Rents to Lender on real property described as "Real Property located at 2325 Marlton Pike, Block 9.01, Lot 5, Cherry Hill, NJ  08034" and located in Camden County, State of New Jersey.

(I) a Mortgage dated March 19, 2009, to Lender on real property described as "Real Property located at 3400 Haddonfield Road, Block 3802, Lot 1, Pennsauken, NJ  08110" and located in Camden County, State of New Jersey.

(J) an Assignment of Leases and Rents to Lender on real property described as "Real Property located at 3400 Haddonfield Road, Block 3802, Lot 1, Pennsauken, NJ  08110" and located in Camden County, State of New Jersey.

(K) a Mortgage dated March 19, 2009, to Lender on real property described as "Real Property located at 331 East Magnolia Avenue, Block 237, Lot 14.03 and 15.03, Wildwood, NJ  08260" and located in Cape May County, State of New Jersey.

(L) an Assignment of Leases and Rents to Lender on real property described as "Real Property located at 331 East Magnolia Avenue, Block 237, Lot 14.03 and 15.03, Wildwood, NJ  08260" and located in Cape May County, State of New Jersey.

(M) inventory, chattel paper, accounts, equipment, general intangibles and fixtures described in Commercial Security Agreements dated March 19, 2009.

**5 YEAR T & R.** There will be an interest rate adjustment option on each fifth (5th) year anniversary following the closing of the Loan.  At each fifth (5th) year anniversary of the Loan (the "Interest Rate Adjustment Date"), the Lender has the option to adjust the interest rate.  Written notice of the exercise of such option shall be provided to the Borrower within a one hundred eighty (180) day period beginning ninety (90) days prior to each fifth (5th) year anniversary following the closing of the Loan. .

**DEPOSIT ACCOUNT REQUIREMENT.** The Borrower and/or Guarantors are required to maintain their existing deposit account relationship with Lender for the term of the Loan.  In the event Borrower and/or Guarantors do not maintain this account relationship with Lender, the Lender will have the option to increase the interest rate on this Loan by one half of one percent at any time during the term of this Loan.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: Cape Bank 225 North Main Street Cape May Ct. Hs., NJ 08210.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**

**JAMES CANDY COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY**

By: _____
  Frank J. Glaser, President of James Candy
  Company, a Corporation of the State of New Jersey

**LENDER:**

**CAPE BANK**

X _____
  Frances J. Goldstein, Senior Vice President

LASER PRO Lending, Ver. 5.43.00.003  Copr. Harland Financial Solutions, Inc. 1997, 2009.  All Rights Reserved.  - NJ  G:\WINAPPS\CFI\LPL\D20.FC  TR-1045  PR-9

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $750,000.00 | 03-19-2009 | 03-01-2010 | 1088.13 | 81 | 1088 | FJG | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  James Candy Company, Inc.
1519 Boardwalk
Atlantic City, NJ  08401

**Lender:**  Cape Bank
Commercial Lending
225 N. Main Street
Cape May Court House, NJ  08210

---

**Principal Amount: $750,000.00**                                    **Date of Note:  March 19, 2009**

**PROMISE TO PAY.** James Candy Company, Inc. ("Borrower") promises to pay to Cape Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Seven Hundred Fifty Thousand & 00/100 Dollars ($750,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance.  Interest shall be calculated from the date of each advance until repayment of each advance.  Borrower also promises to pay all applicable fees and expenses.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on March 1, 2010.  In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning May 1, 2009, with all subsequent interest payments to be due on the same day of each month after that.  Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime as published in the "Money Section" of the Wall Street Journal (the "Index").  The Index is not necessarily the lowest rate charged by Lender on its loans.  If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower.  Lender will tell Borrower the current Index rate upon Borrower's request.  **The interest rate change will not occur more often than each day.**  Borrower understands that Lender may make loans based on other rates as well.  **The Index currently is 3.250% per annum.**  The interest rate to be applied to the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate equal to the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 5.000% per annum based on a year of 360 days.  **NOTICE:  Under no circumstances will the interest rate on this Note be less than 5.000% per annum or more than the maximum rate allowed by applicable law.**

**INTEREST CALCULATION METHOD.  Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  All interest payable under this Note is computed using this method.  This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.  (Initial Here _____ )**

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest.  Rather, early payments will reduce the principal balance due.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender.  All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  Cape Bank, Commercial Lending, 225 N. Main Street, Cape May Court House, NJ  08210.

**LATE CHARGE.** If a payment is 15 days or more late, Borrower will be charged **5.000% of the regularly scheduled payment.**  This late charge shall be paid to Lender by Borrower for the purpose of defraying the expense incident to the handling of the delinquent payment.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, at Lender's option, and if permitted by applicable law, Lender may add any unpaid accrued interest to principal and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased rate).  Upon default, the interest rate on this Note shall be increased by adding a 5.000 percentage point margin ("Default Rate Margin").  The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.  However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any loan.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.  However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness

Case 18-32139-ABA    Doc 3-1    Filed 11/08/18    Entered 11/08/18 18:15:50    Desc
Certification  Page 11 of 51

Loan No: 1088,13

PROMISSORY NOTE
(Continued)

Page 2

evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of New Jersey without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of New Jersey.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Cape May County, State of New Jersey.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $15.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

(A) a Mortgage dated March 19, 2009, to Lender on real property described as "Real Property located at 1517-1519 Boardwalk, Block 50, Lot 29, Atlantic City, NJ" and located in Atlantic County, State of New Jersey.

(B) an Assignment of Leases and Rents to Lender on real property described as "Real Property located at 1517-1519 Boardwalk, Block 50, Lot 29, Atlantic City, NJ" and located in Atlantic County, State of New Jersey.

(C) a Mortgage dated March 19, 2009, to Lender on real property described as "Real Property located at 324-326 Washington Street, Block 1036, Lot 1, Cape May, NJ  08204" and located in Cape May County, State of New Jersey.

(D) an Assignment of Leases and Rents to Lender on real property described as "Real Property located at 324-326 Washington Street, Block 1036, Lot 1, Cape May, NJ  08204" and located in Cape May County, State of New Jersey.

(E) a Mortgage dated March 19, 2009, to Lender on real property described as "Real Property located at 2325 Marlton Pike, Block 9.01, Lot 5, Cherry Hill, NJ  08034" and located in Camden County, State of New Jersey.

(F) an Assignment of Leases and Rents to Lender on real property described as "Real Property located at 2325 Marlton Pike, Block 9.01, Lot 5, Cherry Hill, NJ  08034" and located in Camden County, State of New Jersey.

(G) a Mortgage dated March 19, 2009, to Lender on real property described as "Real Property located at 3400 Haddonfield Road, Block 3802, Lot 1, Pennsauken, NJ  08110" and located in Camden County, State of New Jersey.

(H) an Assignment of Leases and Rents to Lender on real property described as "Real Property located at 3400 Haddonfield Road, Block 3802, Lot 1, Pennsauken, NJ  08110" and located in Camden County, State of New Jersey.

(I) a Mortgage dated March 19, 2009, to Lender on real property described as "Real Property located at 904 Route 130, Block 2201, Lot 15, Cinnaminson, NJ  08077" and located in Burlington County, State of New Jersey.

(J) an Assignment of Leases and Rents to Lender on real property described as "Real Property located at 904 Route 130, Block 2201, Lot 15, Cinnaminson, NJ  08077" and located in Burlington County, State of New Jersey.

(K) a Mortgage dated March 19, 2009, to Lender on real property described as "Real Property located at 331 East Magnolia Avenue, Block 237, Lot 14.03 and 15.03, Wildwood, NJ  08260" and located in Cape May County, State of New Jersey.

(L) an Assignment of Leases and Rents to Lender on real property described as "Real Property located at 331 East Magnolia Avenue, Block 237, Lot 14.03 and 15.03, Wildwood, NJ  08260" and located in Cape May County, State of New Jersey.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested orally by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Frank J. Glaser, President of James Candy Company, Inc.** Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**LOC CLEAN UP PROVISION.** During the term of this Note, there must be a Clean-Up Period. Clean Up period means that: (1) There is at least ten (10%) percent oustanding on the principal balance of the Note (Minimum Balance) (2) the Minimum Balance is then paid down to a zero balance, and (3) the Balance on the Note remains at zero for thirty (30) consecutive days. In the event demand is not sooner made, the entire due and owing on this Note are due and payable in full thirty six months (36) from the date of the Note.

Case 18-32139-ABA  Doc 3-1  Filed 11/08/18  Entered 11/08/18 18:15:50  Desc
Certification  Page 12 of 51


Loan No: 1088,13

PROMISSORY NOTE
(Continued)

Page 3

**DEPOSIT ACCOUNT REQUIREMENT.** The Borrower and/or Guarantors are required to maintain their existing deposit account relationship with Lender for the term of the Loan. In the event Borrower and/or Guarantors do not maintain this account relationship with Lender, the Lender will have the option to increase the interest rate on this Loan by one half of one percent at any time during the term of this Loan.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: Cape Bank 225 North Main Street Cape May Ct. Hs., NJ 08210.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

JAMES CANDY COMPANY, INC.

By: _____
Frank J. Glaser, President of James Candy
Company, Inc.

LENDER:

CAPE BANK

X _____
Frances J. Goldstein, Senior Vice President

LASER PRO Lending, Ver. 5.43.00.003 Copr. Harland Financial Solutions, Inc. 1997, 2009  All Rights Reserved.  - NJ  Q:\WIN\APPS\CFI\LPL\D20.FC  TR-1048  PR-2

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $5,364,000.00 | 03-19-2009 | 04-01-2039 | 1088.12 | 80 | 1088 | FJG | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing " * * * * " has been omitted due to text length limitations.

| Grantor: | James Candy Company, a Corporation of the State of New Jersey<br>1519 Boardwalk<br>Atlantic City, NJ 08401 | Lender: | Cape Bank<br>Commercial Lending<br>225 N. Main Street<br>Cape May Court House, NJ 08210 |
|----------|---|---------|---|

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means James Candy Company, a Corporation of the State of New Jersey and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., the New Jersey Industrial Site Recovery Act, NJSA Section 13:1K-6 ("ISRA"), the New Jersey Spill Compensation and Control Act, NJSA 58:10-23.11, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means James Candy Company, a Corporation of the State of New Jersey.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means Cape Bank, its successors and assigns.

**Note.** The word "Note" means the Note executed by James Candy Company, a Corporation of the State of New Jersey in the principal amount of $5,364,000.00 dated March 19, 2009, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Owner.** The word "Owner" means James Candy Company, a Corporation of the State of New Jersey. The words "Owner" and "Borrower" are used interchangeably.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**THIS COMMERCIAL SECURITY AGREEMENT** dated March 19, 2009, is made and executed between James Candy Company, a Corporation of the State of New Jersey ("Grantor") and Cape Bank ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

**All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles and Fixtures**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

Case 18-32139-ABA    Doc 3-1    Filed 11/08/18    Entered 11/08/18 18:15:50    Desc
COMMERCIAL SECURITY AGREEMENT
Certification    Page 14 of 51
(Continued)

Loan No: 1088,12                                                                                                    Page 2

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

Some or all of the Collateral may be located on the following described real estate:

**1517-1519 Boardwalk, Atlantic City, New Jersey 08401 (the record owner of the real property is James Candy Company, a Corporation of the State of New Jersey; 1519 Boardwalk; Atlantic City, NJ 08401).**

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of New Jersey, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this

Case 18-32139-ABA    Doc 3-1    Filed 11/08/18    Entered 11/08/18 18:15:50    Desc
COMMERCIAL SECURITY AGREEMENT
Certificate of Service    Page 15 of 51
(Continued)

Loan No: 1088,12                                                                    Page 3

Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, including without limitation all environmental laws, ordinances, rules and regulations, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $5,000.00, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

Case 18-32139-ABA    Doc 3-1    Filed 11/08/18    Entered 11/08/18 18:15:50    Desc
COMMERCIAL SECURITY AGREEMENT
Certification Page 16 of 51
(Continued)

Loan No: 1088,12                                                                                                    Page 4

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. This includes making sure Lender is shown as the first and only security interest holder on the title covering the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. If Grantor changes Grantor's name or address, or the name or address of any person granting a security interest under this Agreement changes, Grantor will promptly notify the Lender of such change.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any Related Documents to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Cure Provisions.** If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after receiving written notice from Lender demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the New Jersey Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and

remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Leases and Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of New Jersey without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of New Jersey.**

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Cape May County, State of New Jersey.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the

Case 18-32139-ABA    Doc 3-1    Filed 11/08/18    Entered 11/08/18 18:15:50    Desc
COMMERCIAL SECURITY AGREEMENT
Certification    Page 18 of 51
(Continued)

Loan No: 1088,12                                                                                      Page 6

perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED MARCH 19, 2009.

GRANTOR:

JAMES CANDY COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY



BY: _____
Frank J. Glaser, President of James Candy
Company, a Corporation of the State of New Jersey

LENDER:

CAPE BANK

X _____
Frances J. Goldstein, Senior Vice President

LASER PRO Lending, Ver. 5.43.00.003 Copr. Harland Financial Solutions, Inc. 1997, 2009    All Rights Reserved.    - NJ G:\WINAPPS\CFI\LPL\E40.FC  TR-1045  PR-9

ATLANTIC COUNTY, NJ
EDWARD P. McGETTIGAN, COUNTY CLERK
RCPT # 1372286 RECD BY Laverne
REC FEES $330.00
MARGINAL NOTATION $10.00
NAME FEE $36.00
RECORDED 01/22/2018 11:20:33 AM
INST # 2018003410



# Atlantic County
# Document Summary Sheet

| ATLANTIC COUNTY CLERK<br>5901 MAIN ST<br>MAYS LANDING, NJ 08330 | **Return Name and Address**<br>Law Office of Neal M. Ruben<br>179 Avenue at the Common<br>Suite 201<br>Shrewsbury NJ 07702 |
|---|---|

**Official Use Only**

| Submitting Company | Trident Abstract Title Agency, LLC |
|---|---|
| Document Date *(mm/dd/yyyy)* | 12/13/2017 |
| Document Type | LOAN, NOTE, MORTGAGE MODIFICATION AND ASSUMPTION AGREEME |
| No. of Pages of the Original Signed Document *(Including the cover sheet)* | 31 |
| Consideration Amount *(If applicable)* | $5,364,000.00 |

| | Name(s) | *(Last Name, First Name Middle Initial, Suffix)*<br>*(or Company Name as written)* | Address *(Optional)* |
|---|---|---|---|
| **First Party**<br>*(Grantor or Mortgagor or Assignor)*<br>*(Enter up to five names)* | | James Candy Company<br>Frank Glaser<br>Maureen Glaser<br>Lock Water, Inc.,<br>Fralinger's Inc. | |

| | Name(s) | *(Last Name, First Name Middle Initial, Suffix)*<br>*(or Company Name as written)* | Address *(Optional)* |
|---|---|---|---|
| **Second Party**<br>*(Grantee or Mortgagee or Assignee)*<br>*(Enter up to five names)* | | Ocean First Bank | 975 Hooper Avenue<br>Toms River NJ 08753 |

| | Municipality | Block | Lot | Qualifier | Property Address |
|---|---|---|---|---|---|
| **Parcel Information**<br>*(Enter up to three entries)* | | | | | |

| | Book Type | Book | Beginning Page | Instrument No. | Recorded/File Date |
|---|---|---|---|---|---|
| **Reference Information**<br>*(Enter up to three entries)* | | | | | |

**\*DO NOT REMOVE THIS PAGE\***
DOCUMENT SUMMARY SHEET (COVER SHEET) IS PART OF ATLANTIC COUNTY FILING RECORD. RETAIN THIS PAGE FOR FUTURE REFERENCE.

Record and Return to
Law offices of Neal M. Ruben
179 Avenue at the Common
Suite 201
Shrewsbury, New Jersey 07702

**James Candy Company, Frank Glaser, Maureen Glaser, Lock Water, Inc., Fralinger's Inc., 3400 Haddonfield Rd. Associates, L.L.C., 2325 Marlton Pike West Associates, L.L.C., 904 Route 130 Associates L.L.C., and Westminster Associates, L.L.C.**

**AND**

**OceanFirst Bank, successor by merger to Cape Bank**

---

**LOAN, NOTE, MORTGAGE MODIFICATION AND ASSUMPTION AGREEMENT (2017)**

**Loan #301**

---

This Agreement is Effective as of <u>**December 13, 2017**</u>

**Loan #301**

### LOAN, NOTE,  MORTGAGE MODIFICATION AND ASSUMPTION AGREEMENT (2017)

This Loan, Note, Mortgage Modification and Assumption Agreement (2017) (the "**Agreement**") is made as of December 13 2017, between **OceanFirst Bank, successor by merger to Cape Bank ("OFB,** or "**Lender**" or "**Bank**") having its principal offices located at  975 Hooper Avenue, Toms River New Jersey  and **James Candy Company,** a corporation of the State of New Jersey,  **Lock Water, Inc., Fralinger's Inc., 3400 Haddonfield Rd. Associates, L.L.C., 2325 Marlton Pike West Associates, LLC, 904 Route 130 Associates LLC, and Westminster Associates, L.L.C.,** all having a mailing address of 1519 Boardwalk, Atlantic City, NJ 0840, **Frank Glaser, Maureen Glaser,** both having an address of 14 Otter Lane, Egg Harbor Township, NJ 08234,  (collectively "**Borrower(s)**", "**Obligor(s)**", or "**Mortgagor(s)**").

### WITNESSETH

WHEREAS, on March 19, 2009 James Candy Company entered into a Business Loan Agreement with the Lender wherein the Lender agreed to lend Borrower the sum of Five Million Three Hundred Sixty Four Thousand Dollars ($5,364,000.00) (the "**Loan**").  In association with the Loan James Candy Company executed and delivered, or caused to be delivered, to the Lender the following documents:

(a)    **Loan Agreement** by and between James Candy Company and Lender dated March 19, 2009 (the "Loan Agreement");

(b)    **Promissory Note** dated March 19, 2009  payable by James Candy Company to Lender in the original principal amount of $5,364,000.00  (the "**Note**");

(c)    **Mortgage:** Dated March 19, 2009
Mortgagor: 904 Route 130 Associates, L.L.C.
Name of Original Mortgagee: Cape Bank
Recorded in the  Burlington County Clerk's Office on March 30, 2009 in Mtg Book 11974 Page 583  as Document  No. 4627455
Premises known as:  **904 Route 130, Township of Cinnaminson, County of Burlington, New Jersey, Block 2201, Lot 15**
**Schedule "A"** attached hereto as to legal description of the Property

**Assignment of Leases and Rents** on 904 Route 130, Township of Cinnaminson, County of Burlington, New Jersey.

(d)    **Mortgage:** Dated March 19, 2009
Mortgagor: Westminster Associates, L.L.C.
Name of Original Mortgagee: Cape Bank
Recorded in the  Cape May County Clerk's Office on March 26, 2009 in Mtg Book 4851 Page 315

Premises known as: **331 East Magnolia Avenue, City of Wildwood,
County of Cape May, New Jersey, Block 237, Lots 14.03 and 15.03.**
<u>**Schedule "B"**</u> attached hereto as to legal description of the Property

**Assignment of Leases and Rents** on 331 East Magnolia Avenue, City of
Wildwood, County of Cape May, New Jersey.

(e)    **Mortgage:** Dated March 19, 2009
Mortgagor: James Candy Company, a corporation of the State of New
Jersey.
Name of Original Mortgagee: Cape Bank
Recorded in the Atlantic County Clerk's Office on March 24, 2009 as
Instrument No. 2009020413.
Premises known as: **1517-1519 Boardwalk, City of Atlantic City, County
of Atlantic, New Jersey, Block 50, Lot 29.**
<u>**Schedule "C"**</u> attached hereto as to legal description of the Property

**Assignment of Leases and Rents** on 1517-1519 Boardwalk, City of Atlantic
City, County of Atlantic, New Jersey.

(f)    **Mortgage:** 2325 Marlton Pike, Cherry Hill, NJ. This mortgage has
been released.

(g)    **Mortgage:** 324-326 Washington Street, Cape May, NJ. This mortgage has
been released.

(h)    **Mortgage:** 3400 Haddonfield Rd., Township of Pennsauken,
County of Camden, New Jersey. This mortgage has been released.

(i)    **Guarantees** of Frank Glaser, Maureen Glaser, Lock Water, Inc., Fralinger's Inc.,
3400 Haddonfield Rd. Associates, LLC, 2325 Marlton Pike West Associates, L.L.C., 904 Route
130 Associates L.L.C., and Westminster Associates, L.L.C.

(j)    **UCC-1 Financing Statements** with James Candy Company as debtor and
Lender as secured party, filed with the Secretary of State of New Jersey. A UCC-1 continuation
was subsequently filed.

(k)    **General Documents**-all other documents produced, or utilized in association
with the Loan.

WHEREAS, the Borrower and Lender entered into the following modification agreements
with respect to the Loan:

(a)    **Promissory Note Endorsement Agreement** dated August 30, 2011. Under this
Agreement **Frank Glaser, Maureen Glaser** agreed to become liable under the Loan as primary
Borrowers.

(b)    **Promissory Note Endorsement and Mortgage Modification Agreement** dated
January 31, 2012.

(c)    **Change in Terms Agreement** dated March 2, 2015.

(d)    **Change in Terms Agreement** dated February 17, 2016.

WHEREAS,  all of the above referenced documents, this Agreement, along with each and every other document executed in association with the Loan shall be collectively referred to as the "**Loan Agreements**", " **Loan Documents**" or "**Documents**"); and

WHEREAS, the Obligors and OceanFirst seek to further modify the terms of the Loan; and

**NOW THEREFORE**, in consideration of the sum of One ($1.00) Dollar paid by each of the parties to the other, the receipt whereof is hereby acknowledged, and for other good and valuable consideration, the parties hereto covenant and agree as follows:

1.    **Outstanding Balances Owed on Loan #301.**  Obligors acknowledge and agree that the outstanding balances owed under the Loan as of **December 13, 2017** are as follows:

| | |
|---|---|
| Principal Balance | $2,185,450.29 |
| Interest | $   11,473.61 |
| Appraisal Fee | $     2,400.00 |
| **Total Amount Due** | **$2,199,323.90** |

2.    **Modifications to the Payment Terms of the Loan.**

2.1.    **Balances**.    The outstanding balance owed on the  Loan is modified to be reflected as set forth in paragraph 1 herein (the "**Debt**" or "**Indebtedness**").

2.2.    **Interest Rate**:  The interest rate on the Note shall be fixed at 5.00% (the "Interest Rate").  This rate shall be effective as of the effective date of this Agreement.

2.3.    **Maturity Date:**    The new maturity date of the Note shall be **November 15, 2019** ("**Maturity Date**").   Upon the Maturity Date, the Borrower shall pay the total outstanding principal, interest and other charges owed on the Loan.

2.4.    **Monthly Payments**:   The Loan shall be payable under the following irregular payment schedule based upon a 25 year amortization schedule:

| Payment Due Date | Amount of Monthly Payment Due |
|---|---|
| December 15, 2017 | $16,661.77(P & I), plus the additional accrued interest due from 11/2/17 through 11/15/17 in the amount of $3,824.54. |
| January 15, 2018- June 15, 2018 | $9,198.57 (interest Only) |
| July 15, 2018-December 15, 2018 | $16,661.77 (P & I) |
| January 15, 2019- June 15, 2019 | $9,198.57 (interest Only) |
| July 15, 2019-October 15, 2019 | $16,661.77 (P & I) |
| November 15, 2019 | Maturity Date- Balance of Loan Due |

2.5    **Default Interest Rate**:  In addition to all other rights contained in the Loan Documents and this Agreement, if a Default occurs (as defined under this Agreement and the Loan Documents) and as long as a Default continues, the Note shall bear interest at the Interest Rate plus 5.0 percent (the "**Default Rate**").

2.6    **Deposit Account Requirements**.  The Borrowers shall each maintain their core deposit account relationship with the Lender for the term of the Loan.  In the event any Borrower does not maintain this account relationship with the Lender, the Lender shall, at its option, increase the interest rate on the Loan by one percent (1.00%) at any time during the term of the Loan.  Borrowers waive any notice of the increase by Lender.

3.    **Assumption of Loan Obligations by Additional Co-Borrowers.  Lock Water, Inc., Fralinger's Inc., 3400 Haddonfield Rd. Associates, L.L.C., 2325 Marlton Pike West Associates, L.L.C., 904 Route 130 Associates L.L.C., and Westminster Associates, L.L.C.** ("Assuming Borrower(s)") hereby agree to assume the Debt, along with all other obligations under the Loan Documents as additional primary Co-Borrower parties and shall be jointly and severally liable with the current borrowers, James Candy Company, Frank Glaser, and Maureen Glaser.  Hereinafter, the term Borrowers shall include all Assuming Borrowers.

3.1    The obligations to be assumed include every type and nature set forth in the Loan Documents in accordance with their respective terms and conditions, as the same may be modified by this Agreement, whether such loan documents are referenced in this Agreement or not.   Assuming Borrowers further agree to abide by and be bound by all of the terms of the Loan Documents applicable to the "Borrower" (as applicable), in accordance with their respective terms and conditions, including but not limited to, the representations, warranties, covenants, assurances and indemnifications therein, all as though each of the Loan Documents had been made, executed, and delivered by Assuming Borrowers.  Assuming Borrowers agree to pay when and as due all Indebtedness due under the Loan Documents (and any amendments thereto) and agree to pay, perform, and discharge each and every other obligation of payment and performance of the "Borrower" (as applicable) pursuant to and as set forth in the Loan Documents at the time, in the manner and otherwise in all respects as therein provided.

3.2    Each of the Loan Documents are hereby amended to reflect that the term "Borrower" shall include the Assuming Borrowers, in addition to James Candy Company, Frank Glaser, and Maureen Glaser.

3.3    Assuming Borrowers hereby acknowledge, agree and warrant that (i) there are no rights of set-off or counterclaim, nor any defenses of any kind, whether legal, equitable or otherwise, which would enable Assuming Borrowers to avoid or delay timely performance of its obligations under the Loan Documents, as applicable; and (ii) except with respect to municipal tax liens currently outstanding as of this date, there are no monetary encumbrances  or liens of any kind or nature against the Assuming Borrowers or against the Additional Collateral Properties, except those created by the Loan Documents, and all rights, priorities, titles, liens and equities securing the payment of the Note are expressly recognized as valid and are in all things renewed, continued and preserved in force to secure payment of the Note, except as amended herein.

3.4.    Assuming Borrowers shall not hereafter, without Lender's prior consent in accordance with the terms of the Loan Documents, further encumber, sell or transfer the Property or any interest therein, except as may be specifically permitted in the Loan Documents.

4.    **Additional Representations, Warranties and Covenants of Assuming Borrower**.    As a condition of this Agreement, Assuming Borrower represents and warrants to Lender as follows:

4.1    Each Assuming Borrower is a limited liability company or corporation duly organized, validly existing and in good standing under the laws of the State of New Jersey. Each Assuming Borrower has full power and authority to enter into and carry out the terms of this Agreement and to assume and carry out the terms of the Loan Documents.

4.2    This Agreement and the Loan Documents constitute legal, valid and binding obligations of Assuming Borrower enforceable in accordance with their respective terms. Neither the entry into nor the assumption and performance of and compliance with this Agreement or any of the Loan Documents has resulted or will result in any violation of, or a conflict with or a default under, any judgment, decree, order, mortgage, indenture, contract, agreement or lease by which Assuming Borrower or any property of Assuming Borrower are bound or any statute, rule or regulation applicable to Assuming Borrower.

4.3    There is no action, proceeding or investigation pending or threatened which questions, directly or indirectly, the validity or enforceability of this Agreement or any of the other Loan Documents, or any action taken or to be taken pursuant hereto or thereto, or which might result in any material adverse change in the condition (financial or otherwise) or business of Assuming Borrower.

4.4    Without limiting the generality of the assumption of the Loan Documents by Assuming Borrower, Assuming Borrower hereby specifically remakes and reaffirms the representations, warranties and covenants set forth in the Loan Documents to which it is now a party.

4.5    No representation or warranty of Assuming Borrower made in this Agreement contains any untrue statement of material fact or omits to state a material fact necessary in order to make such representations and warranties not misleading in light of the circumstances under which they are made.

4.6    Each Assuming Borrower hereby represents and warrants to Lender that Assuming Borrower will not permit the transfer of any interest in Assuming Borrower and such transfer shall be a default under this Agreement and the Loan Documents.

5.    **Additional Collateral Mortgages to be Provided:** As consideration for this Agreement and as additional security for the payment of the Loan the Borrowers shall provide, or cause to be provided, a first priority paramount mortgage on the following collateral properties, in the total amount owed on the Loan:

- **1810 Ontario Avenue, Atlantic City, County of Atlantic, New Jersey, (Lot 3, Block 656). Schedule "D"** (to be conveyed by Fralinger's Inc.).

- **171 Westminster Avenue, Atlantic City, County of Atlantic, New Jersey, (Lot 44, Block 51). Schedule "E"** (to be conveyed by Westminster Associates, L.L.C.).

Hereinafter the Ontario and Westminster properties shall be included in the term "**Property**", **Collateral Properties**" or" **Properties**".

6.    **Books And Records; Financial Statements/Other Documents.**

6.1    During the term of the Loan, the Borrower shall keep adequate books and records of account in accordance with generally accepted accounting principles consistently applied and shall furnish or cause to be furnished to the Bank, all in form and substance acceptable to the Bank:

(i)    Within 45 days after the end of each fiscal year of each Borrower financial statements of each Borrower prepared by an independent public accountant satisfactory to the Bank on a compilation basis in accordance with generally accepted principles and practices of accounting consistently applied, accompanied by the report of such accountant acceptable to the Bank and certified by the chief financial officer of each Borrower.

(iii)    Within 45 days after filing thereof, complete, manually signed copies of federal and state tax returns of each Borrower.

(iv)    Within 45 days after the end of each calendar year, annual personal financial statements of Frank Glaser and Maureen Glaser.

(v)    Upon the request of the Bank, a written acknowledgement by the Borrower's accountant, on a form to be provided by the Bank, acknowledging the Bank's reliance upon the professional accounting services provided (and to be provided) by that accountant.

(vi)    Within 15 calendar days after request by the Lender a certified rent roll with respect to the Mortgaged Properties, along with copies of each lease.

(vii).    Periodic Financial Statements.  Within 30 days of request by the Lender each Borrower shall deliver to Lender unaudited management prepared, quarterly financial statements, including, without limitation, a balance sheet, profit and loss statement and statement of cash flows, with supporting schedules, in reasonable detail and prepared in conformity with generally accepted accounting principles, applied on a basis consistent with that of the preceding year.  Such statements shall be certified as to their correctness by a principal financial officer of Borrower.  In addition, upon request Borrower shall deliver to Lender its operating account bank statements.

(viii)    Accounts Receivable/Accounts Payable.  Within 30 days of request by the Lender James Candy Company shall deliver to the Lender its accounts receivable and accounts payable report.

(ix)    Hazard and Flood Insurance.  The Borrower shall deliver to the Lender annually, or as otherwise requested by the Lender, proof of current hazard, flood and liability insurance declarations as appropriate for all Collateral Properties, reflecting the Lender as loss payee, mortgagee and additional insured (for liability).

6.2    The Bank shall have the right to inspect and make copies of the Borrower's books, records and income tax returns.

6.3    Failure to provide the rent rolls, financial statements, tax returns, insurance and other financial information required by this Section within thirty (30) days after written request by the Bank for same shall entitle the Bank to, in addition to and not in limitation

of the other remedies the Bank is afforded hereunder (i) increase the rate of interest payable under the Note by three (3%) percent per annum until such date as the rent rolls, financial statements, tax returns and other financial information are delivered to the Bank; *and/or* (ii) charge a fee of $2,500 or three percent (3%) of the original Note amount (whichever is less).

7.    **Financial Covenants.**  The Borrower shall comply with each of the following financial covenants:

7.1    The Borrower(s) shall not pledge, grant a security interest in, mortgage, assign, encumber or otherwise create a lien on any of its property (whether real or personal, tangible or intangible, and now owned or hereafter acquired) in favor of any person or entity other than Bank, except for those liens, security interests and encumbrances existing on the date hereof and previously disclosed in writing to and approved by the Bank.

7.2    The Borrower shall not enter into any covenant or other agreement that prevents it or could prevent it in the future from pledging, granting a security interest in, mortgaging, assigning, encumbering or otherwise creating a lien on any of its property (whether real or personal, tangible or intangible, and now owned or hereafter acquired) in favor of the Bank, or that would be breached if the Borrower were to pledge, grant a security interest in, mortgage, assign, encumber or otherwise create a lien on any of its property (whether real or personal, tangible or intangible, and now owned or hereafter acquired) in favor of the Bank.

7.3    The Borrower shall not make any loans or advances to any other person or entity, including without limitation, officers, directors, shareholders, principals, partners or affiliates of the Borrower or the Guarantor (if any).

7.4    The Borrower shall not create, incur or assume any indebtedness for borrowed money other than existing indebtedness previously disclosed to and approved by the Bank.

7.5    The Borrower shall not assume, guarantee, endorse or otherwise become directly or contingently liable for the obligations of any other person or entity except by endorsement of negotiable instruments for deposit or collection in the ordinary course of business.

7.6    The Borrower shall not, whether voluntarily, involuntarily or by operation of law, cause or permit the sale, transfer, conveyance, assignment or pledge of, or the encumbering or granting of a security interest in, any ownership interests in the Borrower to or in favor of any person or entity other than the Bank.

8.    **Fees and Expenses to Be Paid at Closing.**

8.1    **Attorneys' Fees/Expenses/Title/Recording Searches**: Borrower acknowledges and agrees that it is responsible for paying the Lender's attorneys' fees and costs associated with this Agreement, including title searches, premiums for title policies, surveys, tax and flood searches and recording.  The Borrower shall satisfy the fees and costs at the time of closing.

9.    **Loan Documents.**  This Agreement and any documents or agreements provided in association herewith shall be included in the term "Loan Agreements", or "Documents" as defined herein.

10.   **Cross-Default.** The Lender and the Borrowers agree that at all times and until payment in full of all of the Indebtedness, liabilities, and obligations whatsoever, kind or nature of the Borrower to the Lender under the Loan including any and all renewals, extensions, modifications, changes and substitutions thereto, the Loan shall be cross-defaulted with any other indebtedness owed to the Bank so that any default under the Loan, or any documents provided therewith, shall constitute a default under any other loan with the Bank.  In the Event of Default Lender shall have the rights set forth in this Agreement, in addition to all remedies set forth in each of the Loan Documents.

11.   **Repair.** The Mortgagors/Borrowers shall keep all buildings, structures and other Improvements existing or to be constructed on the Mortgaged Property from time to time, in good and safe condition and repair.  The Mortgagor shall promptly repair, restore, replace or rebuild any part of the Mortgaged Property which may be destroyed by any casualty, or become damaged, worn or dilapidated, or which may be affected by any condemnation proceeding and shall complete and pay for any structure at any time in the process of construction or repair on the Property.  The Improvements and the Equipment shall not be removed, demolished or materially altered.  All alterations, replacements, renewals or additions made pursuant to this Section shall automatically become and constitute a part of the Mortgaged Property and shall be covered by the lien of the Mortgage.  The Mortgagor shall not do, and shall not permit to be done, any act which may in any way impair or adversely affect the Lender's rights under the Loan Documents.

12.   **Release and Waiver of Claims, Defenses**.  As consideration for entering into this Agreement, Borrowers agree to the following:

12.1   The Borrowers and their representatives, heirs, executors, administrators, representatives, successors, subsidiaries, assigns, affiliates, officers, directors, agents, employees, servants, and attorneys ("Releasor") hereby knowingly, voluntarily, irrevocably, and unconditionally forever waive, release, relinquish, and forever discharge Lender, its predecessors, successors, subsidiaries, assigns, affiliates, officers, directors, agents, employees, servants, attorneys and representatives ("Releasee") from any and all claims, demands, rights, obligations, contracts, agreements, damages, controversies, suits, liabilities, actions, set-offs, or causes of action of any kind or nature whatsoever in law or in equity which the Releasor ever had, now has or may have against Releasee,  whether known, unknown, suspected, or unsuspected for, upon, or by reason of any matter, cause or thing whatsoever, from the beginning of the world to the date of this Agreement (the "Released Claims"),.

12.1.1 Without diminishing or limiting Paragraph 12 or its sub-paragraphs in any way,  Releasor  releases and waives claims in and to the following, which is not intended to be a comprehensive recital:  Including, but not limited to breach of duty of care, want of consideration, failure of consideration, usury, failure to make demand, excessive demands, duress, misrepresentation, common law fraud, consumer fraud, fraud in the inducement, breach of contract, conversion,  RICO, Deceptive Trade Practices, negligence, gross negligence, tort, tortious interference, predatory and abusive lending, unconscionability, lender liability, any State or Federal Law or Statute which would pertain to lender liability, third party liability, bad faith, holder in due course, failure to lend money and any other similar cause of action.

12.2   Without diminishing or limiting Paragraph 12 or its sub-paragraphs in any way, as consideration for this Agreement, Releasor hereby specifically releases and waives any and all claims, counter-claims, defenses and affirmative defenses whatsoever which it has asserted, or could assert in any legal or foreclosure proceedings.   It is the specific intent of the

parties that Releasor hereby forever waives and releases its right to contest any future foreclosure proceeding on the Collateral Properties, or any Law Division Action on the Note seeking a monetary judgment on the Loan based upon any reason whatsoever which exists as of the date of execution of this Agreement.

12.3    Except as otherwise provided by law, Releasor agrees not to assert any claims, charges or other legal proceedings of any nature whatsoever against Lender in any forum, based  upon any events, whether known or unknown, occurring prior to the date of the execution of this Agreement.  Should any government agency or third party pursue any actions or other claims on Debtors' behalf as a class, Releasor hereby waives any right to recovery or monetary award from such action or proceedings except to the extent, if any, such waiver is prohibited by law.

12.4    Releasor understands and agrees that this Release and Waiver of Claims and Defenses is provided as consideration for this Agreement.  Accordingly, even in the Event of a Default the Release and Waiver of claims in favor of Lender/ Releasee as set forth herein shall be unaffected and remain in full force and effect.

13.    **No Modification of Loan Agreements or Documents**.    Nothing in this Agreement is intended to constitute, shall be deemed to constitute, or is a waiver, estoppel, postponement, release, relinquishment, abandonment or any other abrogation or modification of any term or condition of the Loan Agreements or Documents, or any right the Lender may otherwise have with respect to the Loan Agreements, other than as expressly provided for in this Agreement.  Except as specifically modified herein, the Loan Documents shall continue unmodified and in full force and effect.

14.    **Transfer or Encumbrance of The Mortgaged Property.**    Borrowers and Mortgagors, acknowledge that the identity of each Mortgagor and the continuous ownership by each Mortgagor of the Mortgaged Property is a material inducement to the Lender of the extension of the Loan evidenced by the Note, and for this Agreement.  Without the prior written consent of the Lender in each instance, neither: (a) the Mortgaged Property or any part thereof or interest therein; nor (b) if the Mortgagor is a corporation, any capital stock or other equity security in Mortgagor; nor (c) if the Mortgagor is a partnership or limited partnership, any general limited partnership interest in the Mortgagor or any capital stock or other equity security in any corporate partner comprising the Mortgagor, nor (d) if the Mortgagor be a limited liability company, any member's interest in the Mortgagor, shall in any manner be sold, conveyed, assigned, encumbered, hypothecated, issued, redeemed or otherwise transferred.    The provisions of this Section shall apply to each and every such sale, conveyance, assignment, encumbrance, hypothecation, issuance, redemption and other transfer, regardless of whether or not the Lender has consented to, or waived by its action or inaction its rights hereunder with respect to, any such previous sale, conveyance, assignment, encumbrance, hypothecation, issuance, redemption and other transfer.  The Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default in order to declare the Debt immediately due and payable upon a violation of this Section.

15.    **Due On Transfer/Sale- Consent By Lender**.    The Borrower shall not cause or permit any transfer or sale of any of the Collateral Property or any portion thereof, whether voluntary, involuntary, by operation of law, or otherwise, without the prior written consent of the Lender, which consent may be given or withheld in the Lender's sole discretion.  Nor shall the Borrower enter into any agreement or transaction to transfer, or accomplish in form or substance a transfer of the Collateral Property.  A "transfer" or "Sale" means the direct or

indirect sale, transfer or conveyance of the Collateral Property, or the stock, units or interests of the entity owning the Property, including any right title or interest, whether legal, beneficial or equitable, by outright sale, deed, installment sale contract, land contract, leasehold interest with a term greater than three (3) years, lease-option contract, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Collateral Property, or by any other method of conveyance of an interest in real property.

16. **Indemnification.**

16.1   The Borrower hereby indemnifies and agrees to protect, defend and hold harmless the Bank, any entity which "controls" the Bank within the meaning of Section 15 of the Securities Act of 1933, as amended, or is under common control with the Bank, and any member, officer, director, official, agent, employee or attorney of the Bank, and their respective heirs, administrators, executors, successors and assigns (collectively, the "**Indemnified Parties**"), from and against any and all losses, damages, expenses or liabilities of any kind or nature and from any suits, claims or demands, including attorneys' fees incurred in investigating or defending such claim, suffered by any of them and caused by, relating to, arising out of, resulting from, or in any way connected with the Loan Documents or the transactions contemplated therein (unless determined by a final judgment of a court of competent jurisdiction to have been caused solely by the gross negligence or willful misconduct of the Indemnified Parties) including, without limitation: (i) disputes with any architect, general contractor, subcontractor, materialman or supplier, or on account of any act or omission to act by the Bank in connection with the Mortgaged Property; (ii) losses, damages (including consequential damages), expenses or liabilities sustained by the Bank in connection with any environmental inspection, monitoring, sampling or cleanup of the Mortgaged Property required or mandated by any applicable Environmental Law; (iii) any untrue statement of a material fact contained in information submitted to the Bank by the Borrower or the omission of any material fact necessary to be stated therein in order to make such statement not misleading or incomplete; (iv) the failure of the Borrower to perform any obligations herein required to be performed by the Borrower; and (v) the ownership, construction, occupancy, operation, use or maintenance of the Mortgaged Property.

16.2   In case any action shall be brought against the Bank or any other Indemnified Party in respect to which indemnity may be sought against the Borrower, the Bank or such other Indemnified Party shall promptly notify the Borrower and the Borrower shall assume the defense thereof, including the employment of counsel selected by the Borrower and satisfactory to the Bank, the payment of all costs and expenses and the right to negotiate and consent to settlement. The failure of the Bank to so notify the Borrower shall not relieve the Borrower of any liability it may have under the foregoing indemnification provisions or from any liability which it may otherwise have to the Bank or any of the other Indemnified Parties. The Bank shall have the right, at its sole option, to employ separate counsel in any such action and to participate in the defense thereof, all at the Borrower's sole cost and expense. The Borrower shall not be liable for any settlement of any such action effected without its consent, but if settled with the Borrower's consent, or if there be a final judgment for the claimant in any such action, the Borrower agrees to indemnify and save harmless the Bank from and against any loss or liability by reason of such settlement or judgment.

16.3   The provisions of this Section shall survive the repayment or other satisfaction of the Loan.

17.   **No Release of Existing Collateral.** Except as set forth herein, nothing in this Agreement is intended to, in any way, release or lessen the collateral given to secure the payment of the Loan, or the performance of the Borrower.

18.   **Events of Default.** The Debt shall become immediately due and payable at the option of the Bank (or automatically, if an event described in subparagraphs 18.6, 18.7 and 18.8 occurs with respect to the Mortgagor) upon the occurrence of any one of the following events (each event being referred to in this Mortgage as an **"Event of Default"**) (in addition to any rights or remedies available to it hereunder or under the Note or any other of the Loan Documents or otherwise available at law or in equity):

18.1.   if any portion of the Debt is not paid when due; or

18.2.   if any of the Impositions, including real estate taxes are not paid when the same are due and payable; or

18.3.   if any of the Insurance Policies are not kept in full force and effect, or if any of the Policies are not assigned and delivered to the Bank upon request; or

18.4.   if any representation or warranty of the Borrower or any Guarantor made in the Loan Documents or in any certificate, report, financial statement or other instrument or document furnished to the Bank shall have been false or misleading in any material respect as of the date when made; or

18.5.   if any Borrower or Guarantor makes an assignment for the benefit of creditors; or

18.6.   if a court of competent jurisdiction enters a decree or order for relief with respect to any Borrower, Mortgagor or any Guarantor under Title 11 of the United States Code as now constituted or hereafter amended (the **"Bankruptcy Code"**) or under any other applicable Federal or state bankruptcy law or other similar law, or if such court enters a decree or order appointing a receiver, liquidator, assignee, trustee, sequestrator (or similar official) of the Borrower, Mortgagor or any Guarantor, or any substantial part of their respective properties or of the Mortgaged Property, or if such court decrees or orders the winding up or liquidation of the affairs of the Borrower, Mortgagor or any Guarantor; or

18.7.   if any Borrower or any Guarantor files a petition or answer or consent seeking relief under Title 11 of the United States Code as now constituted or hereafter amended or under any other applicable Federal or state bankruptcy law or other similar law, or if the Borrower or any Guarantor consents to the institution of proceedings thereunder or to the filing of any such petition or the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of the Borrower or any Guarantor, or any substantial part of their respective properties or of the Mortgaged Property, or if the Borrower or any Guarantor does not pay their respective debts as such debts become due, or if the Borrower or any Guarantor takes any action in furtherance of any action described in this subparagraph; or

18.8.   if any Borrower is in default under any mortgage or security agreement covering any part of the Mortgaged Property, whether it be superior or junior in lien to the Bank's Mortgage; or

18.9.  if the Mortgaged Property becomes subject to any construction or other lien and such lien or lien claim remains undischarged of record (by payment, bonding in an amount satisfactory to the Bank or otherwise, as approved by the Bank) for a period of thirty (30) days after the filing thereof; or

18.10.  if any Borrower or Mortgagor fails to cure promptly any violation of laws or ordinances affecting the Mortgaged Property; or

18.11.  the termination or dissolution by any Borrower of its partnership, its corporation or its limited liability company, as applicable, or the cessation of doing business by the Mortgagor; or

18.12.  if any Borrower or any Guarantor is in default under any other instrument or agreement with the Bank, whether or not it is related to the Debt or the Mortgages; or

18.13.  any change whatsoever in the ownership or control of any Borrower or Guarantor, whether or not that change is voluntary, involuntary, by operation of law or direct or indirect; or

18.14.  the death of any individual Borrower or Guarantor unless the estate of the decedent notifies the Bank of such death and reaffirms in writing the obligations of the Estate to the Bank within thirty (30) days of the date of death, and an additional party is added to the Loan as an additional Borrower, which party is acceptable to the Bank; or

18.15.  any change in the condition or affairs of any Borrower or Guarantor (financial or otherwise) as a result of which the Bank shall deem itself insecure; or

18.16.  if an Event of Default shall occur under the Loan Agreement or under any of the other Loan Documents;

18.17.  if there shall occur the entry of any judgment, issuance of any garnishment, attachment or distraint, the filing of any lien or of any government attachment against any Borrower or Mortgaged Property, which entry, issuance, attachment or filing shall have continued unstayed and in effect for a period of thirty (30) consecutive days, or if a writ of execution or attachment or any similar process shall be issued or levied against all or any part of or interest in any of the properties or assets of any Borrower or any judgment involving monetary damages shall be entered against any Borrower or Mortgagor or which shall become a lien on the Mortgagor's properties or assets or any portion thereof or interest therein and an appeal is not taken and actively prosecuted on such judgment within thirty (30) days of its entry, or such execution, attachment or similar process is not released, bonded, satisfied, vacated or stayed within thirty (30) days after its entry or levy; or

18.18.  the loss of any governmental license or permit needed for the operation of the business on the Mortgaged Property; or

18.19.  if the Bank's Mortgage shall not create or remain as a valid first lien for the Indebtedness secured on the Mortgaged Property, satisfactory to the Bank.

19.    **Rights of the Lender in the Event of Default.**  Upon the occurrence of any Event of Default, the Lender may  take such action with or without entry, and without notice, demand, presentment or protest (each and all of which are hereby waived), as it deems

necessary to protect and enforce its rights and remedies against the Borrower, Mortgagor and in and to the Mortgaged Property, including the following actions, which may be pursued concurrently or otherwise, at such times and in such order as the Lender may determine, in its sole discretion, without impairing or otherwise affecting its other rights or remedies, with the understanding that the Lender's election not to immediately pursue any of its remedies shall not be construed in any way to  limit or waive its rights to subsequently pursue that remedy:

19.1.    Declare the entire balance of the Debt to be immediately due and payable, whereupon the entire unpaid balance of the Debt shall become and be immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by Mortgagor;

19.2.    Institute a proceeding or proceedings, for the complete or partial foreclosure of any Mortgage;

19.3.    Sell the Mortgaged Property, and all estate, right, title, interest, claim and demand of the Mortgagor therein, and all rights of redemption thereof, at one or more sheriff's sales;

19.4.    Institute an action, suit or proceeding at law or in equity for the enforcement of the Note, Mortgage or any other instrument or agreement executed in connection with the Loan;

19.5    Petition the court for the appointment of a receiver, custodian, trustee, liquidator or conservator of any Mortgaged Property;

19.6.    With or without the entrance upon the Property, collect, receive, sue for and recover in its own name all rents and cash collateral derived from the Mortgaged Property;

19.7.    Take all actions permitted under the Uniform Commercial Code; and

19.8.    Take any other action, or pursue any other right or remedy, as the Lender may have under any of the other Loan Documents or applicable law.

20.    **Notices.**    Unless otherwise specified herein, all notices, requests, consents, approvals demands or other communications to or from the parties hereto shall be in writing and send by FedEx, certified mail or other nationally recognized courier, or regular mail, postage prepaid.  Any notice which is required to be served under this Agreement shall be served upon the parties as follows, which shall be deemed good service:

<u>Upon the  Borrower(s) at the addresses set forth on page one hereof</u>

**Upon the  Bank:**
OceanFirst Bank
975 Hooper Avenue
Toms River, New Jersey  08753
Attention: Stephen H. Haak, Vice President
Facsimile No.: (732) 818-7964

**With a copy to:**
OceanFirst Bank
975 Hooper Avenue

Toms River, New Jersey 08753
Attention: General Counsel
Facsimile No.: (732) 818-7969

If any of the above addresses shall change, it shall be the changed parties' burden to inform the noticing party.

21. **Relief From Bankruptcy Stay**. The Borrowers each agree that, in the event that the Borrower or any Guarantor or any of the persons or parties constituting the Obligor shall: (a) file with any Bankruptcy Court of competent jurisdiction or be the subject of any petition under the Bankruptcy Code; (b) be the subject of any order for relief entered under the Bankruptcy Code; (c) file or be the subject of any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to Bankruptcy, insolvency, or other relief for debtors; (d) have sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator, or liquidator; or (e) be the subject of any order, judgment, or decree entered by any court of competent jurisdiction approving a petition filed against such party for any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to Bankruptcy, insolvency, or relief for debtors, the Lender shall thereupon be entitled and the Borrower each irrevocably consent to immediate and unconditional relief from any automatic stay imposed by Section 362 of the Bankruptcy Code, or otherwise, on or against the exercise of the rights and remedies otherwise available to the Lender as provided for in this Agreement, the Loan Documents, or otherwise provided by law, including relief for the purpose of commencing or continuing foreclosure proceedings on the Collateral Property, and the Borrower and Guarantors hereby irrevocably waive any right to object to such relief and will not contest any motion by the Lender seeking relief from the automatic stay and the Borrower will cooperate with the Lender, in any manner requested by the Lender, in its efforts to obtain relief from any such stay or other prohibition. Nothing herein shall prohibit the Lender from seeking relief against any collateral through application to the appropriate court.

22. **Use And Occupancy.** In addition to the rights which the Bank may have herein, upon the occurrence of any Event of Default, the Bank, at its option, may require the Borrower, Mortgagor or Guarantor to pay monthly in advance to the Bank, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupancy of such part of the Mortgaged Property as may be occupied by the Borrower, Mortgagor or Guarantor or may require the Borrower, Mortgagor or Guarantor to vacate and surrender possession of the Mortgaged Property to the Bank or to such receiver and, in default thereof, the Borrower, Mortgagor or Guarantor may be evicted by summary proceedings or otherwise.

23. **Modification.** The Mortgage and Note and the Debt are subject to "modification" (as such term is defined in Chapter 353 of the Public Laws of 1985, N.J.S.A. 46:9-8.1 et seq.), and the priority of the lien of the Construction Mortgage and Second Mortgage with respect to any and all modifications (as so defined) shall relate back to and remain as it was at time of the recording of the respective Mortgages (as if such modification were originally included in the Mortgage or as if the modification occurred at the time of the recording of the Mortgage), as provided in such statute.

24.   **Miscellaneous.**

24.1   **Successors and Assigns/ Assignment.** This Agreement and the other Loan Documents shall inure to the benefit of and be binding upon the parties and their respective heirs, legal representatives, successors and assigns. Lender's interests in and rights under this Agreement and other Loan Documents are freely assignable, in whole or in part, by Lender. Borrower shall not assign its rights and interests hereunder without the prior written consent of Lender, and any attempt by Borrower to assign without Lender's prior written consent is null and void. Any assignment shall not release Borrower from the Obligations.

24.2.   **Execution in Counterparts:   Facsimile.** This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Execution and delivery by facsimile is valid.

24.3.   **Headings:   Table of Contents.** The sections and other headings contained in this Agreement are for reference purposes only and shall not control or affect the construction of this Agreement or the interpretation hereof in any respect.

24.4.   **Conflict With Other Agreements.** In the event of any conflict between the terms, covenants and conditions of this Agreement and any of the other Loan Agreements, including Modification Agreements, the terms, covenants and conditions which shall enlarge the rights and remedies of the Lender and the interest of the Lender in various collateral pledged by the Borrower, afford the Lender greater financial security in the collateral and better assure payment of the obligations under the Loan Agreements in full, shall control.

24.5.   **Construction of Agreement.** The parties hereto agree that the terms and language of this Agreement were the result of negotiations between the parties under advice of counsel and, as a result, there shall be no presumption that ambiguities, if any, in this Agreement shall be resolved against either party. Any controversy over the construction of this Agreement shall be decided neutrally, in light of its conciliatory purposes, and without regard to events of authorship or negotiation.

24.6   **No Novation.** Except as otherwise provided for in this Agreement, this Agreement does not represent in any way the satisfaction of the Indebtedness evidenced by the Loan Agreements. It is the intention of the parties hereto that this Agreement shall not constitute a novation and shall in no way adversely affect or impair the lien priority of any instrument securing the Note(s), except as otherwise provided for herein.

24.7.   **Incorporation of Recitals.** The recitals set forth in the Recital Section of this Agreement are hereby incorporated by reference into this Agreement, as if fully set forth at length herein, made a part hereof, and acknowledged by the Borrower to be true and correct as of the date hereof.

24.8.   **Severability.** This Agreement shall be governed by New Jersey State and applicable Federal Law. In the event that any provision or clause herein conflicts with applicable law, such conflict shall not affect other provisions of this Agreement which can be given effect without the conflicting provision. To this end the provisions of this Agreement are declared to be severable.

24.9.  **Entire Agreement**.  This Agreement embodies the entire agreement between the parties.  No other promises or assurances have been made by the Lender.

24.10.  **Cumulative Remedies**.  All remedies contained in this Agreement are cumulative and Lender shall also have all other remedies provided at law and in equity contained in the Loan Documents.  Such remedies may be pursued separately, successively or concurrently at the sole discretion of Lender and may be exercised in any order and as often as occasion therefor shall arise.

24.11.  **Perfection of Security Interest**.  Borrower hereby agrees that it shall provide to the Lender any document, instrument or other thing necessary for Lender to maintain or perfect the Lender's first priority security interest in the Property.  Borrower further consents to the filing of uniform commercial finance statements against it and the Collateral Property.

24.12  **Jurisdiction & Venue**.  This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey (except New Jersey Conflict of Laws).  The Borrower hereby irrevocably consents and agrees to the non-exclusive jurisdiction of the State Courts of the State of New Jersey, and further waives any and all objections the undersigned may have to the venue of any action, being placed in the State Courts of the State of New Jersey.

24.13.  **JURY WAIVER.    THE PARTIES AGREE THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE BORROWER, BY EXECUTION HEREOF, AND THE LENDER BY ACCEPTANCE HEREOF, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT EXECUTED IN ASSOCIATION WITH THIS AGREEMENT, THE LOAN AGREEMENTS OR ANY AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO.**

*IN WITNESS WHEREOF*, the parties hereto have set their hands and seal the day and year first above written or have caused these present to be signed by their proper corporate officers and their corporate seals hereto affixed the day and year first above written.

Witness/Attest

_____

**OCEANFIRST BANK**

By:_____
Stephen H. Haak, Vice President

**JAMES CANDY COMPANY, a
Corporation of the State of New
Jersey**

By: _____
Frank J. Glaser, President

**FRANK J. GLASER AND
MAUREEN P. GLASER**

_____
Frank J. Glaser, Individually

_____
Maureen P. Glaser, Individually

**LOCK WATER, INC.**

By: _____
Frank J. Glaser, President

By: _____
Maureen P. Glaser, Secretary

**FRALINGER'S INC.**

By: _____
Frank J. Glaser, President

**3400 HADDONFIELD ROAD
ASSOCIATES, L.L.C.**

By: _____
Frank J. Glaser, Member

By: _____
Maureen P. Glaser, Member

**2325 MARLTON PIKE WEST**
**Associates, L.L.C.**

By: _____
Frank J. Glaser, Member

By: _____
Maureen P. Glaser, Member

**904 ROUTE 130 ASSOCIATES,**
**L.L.C.**

By: _____
Frank J. Glaser, Member

By: _____
Maureen P. Glaser, Member

**WESTMINSTER ASSOCIATES,**
**L.L.C.**

By: _____
Frank J. Glaser,
Managing Member

## ACKNOWLEDGMENTS

**OceanFirst Bank**

STATE OF  NEW JERSEY          )
                             ) SS:
COUNTY OF ATLANTIC           )

I CERTIFY that on December 13, 2017, *Stephen H. Haak  Vice President*, personally came before me and acknowledged under oath, to my satisfaction, that;

(a)    She/he is the  *Vice President*  of OceanFirst Bank, the Bank named in this document; and

(b)    This person is the attesting witness to the signing of this document by the proper Bank officer who is Steven Haak, Vice President of the Bank; and

(c)    This document was signed and delivered by the Bank as its voluntary act duly authorized by a proper resolution of its Board of Directors; and

(d)    This person knows the proper seal of the Bank which was affixed to this document; and

(e)    This person signed this proof to attest to the truth of these facts.

Notary Public

DENISE MENDICK
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires June 18, 2018

**James Candy Company**

STATE OF NEW JERSEY          )
                             ) SS:
COUNTY OF MONMOUTH           )

I CERTIFY that on December 13, 2017, **Frank J. Glaser,** personally came before me, and this person acknowledged under oath, to my satisfaction, that (a)      this person is the President of **James Candy Company**, the corporation named in this document: (b) this document was signed and delivered by the corporation as its voluntary act duly authorized by a proper resolution of the Board of Directors; (c) this person knows the proper seal of the corporation which was affixed to this document; and (d) this person signed this proof to attest to the truth of these facts.

Notary Public

JENNIFER A. COSTA
Notary Public of New Jersey
My Commission Expires October 22, 2022

**Frank J. Glaser**

STATE OF   NEW JERSEY          )
                              ) SS:
COUNTY OF  MONMOUTH           )

I CERTIFY that on December 13, 2017, **Frank J. Glaser** personally came before me and acknowledged under oath, to my satisfaction, that this person (or if more than one, each person) (a) is named and personally signed the attached document; and (b) signed, sealed and delivered this document as his  act and deed.

Notary Public

JENNIFER A. COSTA
Notary Public of New Jersey
My Commission Expires October 22, 2022

**Maureen P. Glaser**

STATE OF   NEW JERSEY          )
                              ) SS:
COUNTY OF  MONMOUTH           )

I CERTIFY that on December 13, 2017, **Maureen P. Glaser** personally came before me and acknowledged under oath, to my satisfaction, that this person (or if more than one, each person) (a) is named and personally signed the attached document; and (b) signed, sealed and delivered this document as his  act and deed.

Notary Public

JENNIFER A. COSTA
Notary Public of New Jersey
My Commission Expires October 22, 2022

**Lock Water, Inc.**

STATE OF NEW JERSEY          )
                            ) SS:
COUNTY OF MONMOTH           )

I CERTIFY that on December 13,  2017, **Frank J. Glaser,** personally came before me, and this person acknowledged under oath, to my satisfaction, that (a)      this person is the President of **Lock Water, Inc.** the corporation named in this document: (b)   this document was  signed and delivered by the corporation as its voluntary act duly authorized by a proper resolution of the Board of Directors; (c) this person knows the proper seal of the corporation which was affixed to this document; and (d)this person signed this proof to attest to the truth of these facts.

Notary Public

JENNIFER A. COSTA
Notary Public of New Jersey
My Commission Expires October 22, 2022

STATE OF NEW JERSEY          )
                            ) SS:
COUNTY OF MONMOUTH           )

I CERTIFY that on December 13, 2017, **Maureen Glaser,** personally came before me, and this person acknowledged under oath, to my satisfaction, that (a)  this person is the Secretary of **Lock Water, Inc.** the corporation named in this document: (b)  this document was signed and delivered by the corporation as its voluntary act duly authorized by a proper resolution of the Board of Directors; (c) this person knows the proper seal of the corporation which was affixed to this document; and (d)this person signed this proof to attest to the truth of these facts.

Notary Public

GAIL S. MCARDLE
A Notary Public of New Jersey
My Commission Expires July 11, 2018

**Fralinger's Inc.**

STATE OF NEW JERSEY          )
                            ) SS:
COUNTY OF MONMOUTH           )

I CERTIFY that on December 13, 2017, **Frank J. Glaser,** personally came before me, and this person acknowledged under oath, to my satisfaction, that (a)      this person is the President of **Fralinger's Inc.,** the corporation named in this document; (b)   this document was signed and delivered by the corporation as its voluntary act duly authorized by a proper resolution of the Board of Directors; (c) this person knows the proper seal of the corporation which was affixed to this document; and (d)this person signed this proof to attest to the truth of these facts.

Notary Public

GAIL S. MCARDLE
A Notary Public of New Jersey
My Commission Expires July 11, 2018

**2325 Marlton Pike West Associates, L.L.C.**

STATE OF NEW JERSEY          )
                            ) SS.:
COUNTY OF MOMOUTH            )

Be it remembered that on this 13TH day of December, 2017 before me the subscriber personally appeared **Frank J. Glaser,** who I am satisfied is the person who signed the within instrument and he acknowledged that he is authorized to and signed the within instrument as Member/Manager and that the within instrument is the voluntary act and deed of **2325 Marlton Pike West Associates, L.L.C.**

(Notary Public)

GAIL S. MCARDLE
A Notary Public of New Jersey
My Commission Expires July 11, 2018

| | |
|---|---|
| STATE OF NEW JERSEY | ) |
| | ) SS.: |
| COUNTY OF MONMOUTH | ) |

Be it remembered that on this 13TH day of December, 2017 before me the subscriber personally appeared **Maureen P. Glaser**, who I am satisfied is the person who signed the within instrument and he acknowledged that he is authorized to and signed the within instrument as Member/Manager and that the within instrument is the voluntary act and deed of **2325 Marlton Pike West Associates, L.L.C.**

(Notary Public)

GAIL S. MCARDLE
A Notary Public of New Jersey
My Commission Expires July 11, 2018

### 3400 Haddonfield Road  Associates, L.L.C.

| | |
|---|---|
| STATE OF NEW JERSEY | ) |
| | ) SS.: |
| COUNTY OF MONMOUTH | ) |

Be it remembered that on this 13TH day of December, 2017 before me the subscriber personally appeared **Frank J. Glaser**, who I am satisfied is the person who signed the within instrument and he acknowledged that he is authorized to and signed the within instrument as Member/Manager and that the within instrument is the voluntary act and deed of **3400 Haddonfield Road  Associates, L.L.C.**

(Notary Public)

TAYLOR L. CALLAHAN
Notary Public of New Jersey
My Commission Expires September 25, 2022

| | |
|---|---|
| STATE OF NEW JERSEY | ) |
| | ) SS.: |
| COUNTY OF MONMOUTH | ) |

Be it remembered that on this 13TH day of December, 2017 before me the subscriber personally appeared **Maureen P. Glaser**, who I am satisfied is the person who signed the within instrument and he acknowledged that he is authorized to and signed the within instrument as Member/Manager and that the within instrument is the voluntary act and deed of **3400 Haddonfield Road  Associates, L.L.C.**

(Notary Public)

TAYLOR L. CALLAHAN
Notary Public of New Jersey
My Commission Expires September 25, 2022

**2325 Marlton Pike West Associates, L.L.C.**

STATE OF NEW JERSEY                )
                                   ) SS.:
COUNTY OF MONMOUTH                 )

Be it remembered that on this 13TH day of December, 2017 before me the subscriber personally appeared **Frank J. Glaser**, who I am satisfied is the person who signed the within instrument and he acknowledged that he is authorized to and signed the within instrument as Member/Manager and that the within instrument is the voluntary act and deed of **2325 Marlton Pike West Associates, L.L.C.**

(Notary Public)

TAYLOR L. CALLAHAN
Notary Public of New Jersey
My Commission Expires September 25, 2022

STATE OF NEW JERSEY                )
                                   ) SS.:
COUNTY OF MONMOUTH                 )

Be it remembered that on this 13TH day of December, 2017 before me the subscriber personally appeared **Maureen P. Glaser**, who I am satisfied is the person who signed the within instrument and he acknowledged that he is authorized to and signed the within instrument as Member/Manager and that the within instrument is the voluntary act and deed of **2325 Marlton Pike West Associates, L.L.C.**

(Notary Public)

TAYLOR L. CALLAHAN
Notary Public of New Jersey
My Commission Expires September 25, 2022

**904 Route 130 Associates, L.L.C.**

STATE OF NEW JERSEY                )
                                   ) SS.:
COUNTY OF MONMOUTH                 )

Be it remembered that on this 13TH day of December, 2017 before me the subscriber personally appeared **Frank J. Glaser**, who I am satisfied is the person who signed the within instrument and he acknowledged that he is authorized to and signed the within instrument as Member/Manager and that the within instrument is the voluntary act and deed of **904 Route 130 Associates, L.L.C.**

(Notary Public)
NOELLE C. TEUTONICO
NOTARY PUBLIC OF NEW JERSEY
ID # 2450989
My Commission Expires 12/1/2019

STATE OF NEW JERSEY                    )
                                       ) SS.:
COUNTY OF MONMOUTH                     )

Be it remembered that on this 13TH day of December, 2017 before me the subscriber personally appeared **Maureen P. Glaser**, who I am satisfied is the person who signed the within instrument and he acknowledged that he is authorized to and signed the within instrument as Member/Manager and that the within instrument is the voluntary act and deed of **904 Route 130 Associates, L.L.C.**

_____
(Notary Public)

NOELLE C. TEUTONICO
NOTARY PUBLIC OF NEW JERSEY
ID # 2450989
My Commission Expires 12/1/2019

**Westminster Associates, L.L.C.**

STATE OF NEW JERSEY                    )
                                       ) SS.:
COUNTY OF MONMOUTH                     )

Be it remembered that on this 13TH day of December, 2017 before me the subscriber personally appeared **Frank J. Glaser**, who I am satisfied is the person who signed the within instrument and he acknowledged that he is authorized to and signed the within instrument as Member/Manager and that the within instrument is the voluntary act and deed of **Westminster Associates, L.L.C.**

_____
(Notary Public)

NOELLE C. TEUTONICO
NOTARY PUBLIC OF NEW JERSEY
ID # 2450989
My Commission Expires 12/1/2019

STATE OF NEW JERSEY                    )
                                       ) SS.:
COUNTY OF MONMOUTH                     )

Be it remembered that on this 13TH day of December, 2017 before me the subscriber personally appeared **Maureen P. Glaser**, who I am satisfied is the person who signed the within instrument and he acknowledged that he is authorized to and signed the within instrument as Member/Manager and that the within instrument is the voluntary act and deed of **Westminster Associates, L.L.C.**

_____
(Notary Public)

NOELLE C. TEUTONICO
NOTARY PUBLIC OF NEW JERSEY
ID # 2450989
My Commission Expires 12/1/2019

## Schedule "A"
### Legal descriptions of the Property

**Schedule "A"** - 904 Route 130, Township of Cinnaminson, County of Burlington, New Jersey, Block 2201, Lot 15

**Schedule "B"**- 331 East Magnolia Avenue, City of Wildwood, County of Cape May, New Jersey, Block 237, Lots 14.03 and 15.03.

**Schedule "C"**- 1517-1519 Boardwalk, City of Atlantic City, County of Atlantic, New Jersey, Block 50, Lot 29.

**Schedule "D"** - 1810 Ontario Avenue, Atlantic City, County of Atlantic, New Jersey, (lot 3, Block 656).

**Schedule "E"**- 171 Westminster Avenue, Atlantic City, County of Atlantic, New Jersey, (lot 44, Block 51) .

*1517-*

## LEGAL DESCRIPTION/RECITAL EXHIBIT

All that certain lot, tract or parcel of land and premises situate, lying and being in the Atlantic City, County of Atlantic, State of New Jersey, bounded and described as follows:

### TRACT 1

BEGINNING at a point in the Southerly line of Westminster Avenue, said point being 910 feet Southwardly from the Southerly line of Pacific Avenue, and 191.8 feet Eastwardly from the Easterly line of Kentucky Avenue, said distance being measured on lines drawn at right angles to said Avenues and extending thence

(1) Southwardly parallel with Kentucky Avenue and Kentucky Avenue, extended, 1,090 feet, more or less, to the exterior line established by the Riparian Commissioners of New Jersey; thence

(2) Eastwardly along the said line, 19.6 feet, more or less, to a point distant 211.4 feet Eastwardly from the Easterly line of Kentucky Avenue, extended measured on a line drawn at right angles thereto; thence

(3) Northwardly parallel with Kentucky Avenue extended and Kentucky Avenue, 1,090 feet, more or less, to a point in the Southerly line of Westminster Avenue, said point being 910 feet Southwardly from the Southerly line of Pacific Avenue and 211.4 feet Eastwardly from the Easterly line of Kentucky Avenue, said distance being measured on lines drawn at right angles to said Avenues; thence

(4) Westwardly, along the Southerly line of Westminster Avenue, 19.6 feet to the place of BEGINNING.

### TRACT 2

BEGINNING at a point distant 211.4 feet Eastwardly from the Easterly line of Kentucky Avenue, measured on a line at right angles with Kentucky Avenue and 1,053 feet Southwardly from the Southerly line of Pacific Avenue, measured on a line at right angles with Pacific Avenue and extending thence

(1) Eastwardly, parallel with Pacific Avenue, 19.7 feet; thence

(2) Northwardly, parallel with Kentucky Avenue, 50 feet; thence

(3) Westwardly, parallel with Pacific Avenue, 19.7 feet to a point; thence

(4) Southwardly, parallel with Kentucky Avenue, 50 feet to the PLACE OF BEGINNING.

### TRACT 3

BEGINNING at a point 211.4 feet Eastwardly from the Easterly line of Kentucky Avenue, measured on a line at right angles with Kentucky Avenue, 1,053 feet Southwardly from the Southerly line of Pacific Avenue measured on a line at right angles with Pacific Avenue and extending thence

(1) Eastwardly, parallel with Pacific Avenue, 19.7 feet; thence

(2) Southwardly, parallel with Kentucky Avenue and Kentucky Avenue, extended, 947 feet, more or less, to the exterior line established by the Riparian Commissioners of New Jersey; thence

(3)  Westwardly, along the said exterior line, 19.7 feet, more or less, to a point 211.4 feet Eastwardly from the Easterly line of Kentucky Avenue, extended, measured on a line drawn at right angles thereto; thence

(4)  Northwardly, parallel with Kentucky Avenue, extended, and Kentucky Avenue, 947 feet, more or less, to the PLACE OF BEGINNING.

TRACT 4

BEGINNING at a point in the center line of Westminster Avenue, said point being 211.4 feet Eastwardly from the Easterly line of Kentucky Avenue, measured on a line at right angles with Kentucky Avenue, and 900 feet Southwardly from the Southerly line of Pacific Avenue, measured on a line at right angles with Pacific Avenue and extending thence:

(1)  Southwardly parallel with Kentucky Avenue, 103 feet to a point, 211.4 feet Eastwardly from the Easterly line of Kentucky Avenue, measured on a line at right angles with Kentucky Avenue and 1,003 feet Southwardly from the Southerly line of Pacific Avenue, measured on a line at right angles with Pacific Avenue; thence

(2)  Eastwardly, parallel with Pacific Avenue, 19.7 feet; thence

(3)  Southwardly, parallel with Kentucky Avenue, 11 feet; thence

(4)  Eastwardly, parallel with Pacific Avenue, 16.26, more or less, to the old Penrose division line; thence

(5)  North, deflecting 02 degrees 03 minutes 12 seconds West from a line parallel with Kentucky Avenue, along said division line, 114.07 feet, more or less, to a point in the center line of Westminster Avenue, said point being 900 feet Southwardly from the Southerly line of Pacific Avenue, measured on a line at right angles with Kentucky Avenue, and 243.28 feet Eastwardly from the Easterly line of Kentucky Avenue, measured on a line at right angles with Kentucky Avenue; thence

(6)  Westwardly, along the center line of Westminster Avenue and parallel with Pacific Avenue, 31.88 feet to the PLACE OF BEGINNING.

TRACTS 1, 2, 3 AND 4 BEING KNOWN AS Lot 29 in Block 50 as shown on the Tax Map of the City of Atlantic City.

COMMONLY KNOWN AS 1517-1519 Boardwalk.

Being the same land and premises vesting in

JAMES CANDY COMPANY, a Corporation of the State of New Jersey

By Deed From Lee-Har, Inc. a dissolved corporation of the State of New Jersey, by Lee G. James, Harry E. James and Charles Marean, as statutory trustees in dissolution, to James Candy Company, a corporation of the State of New Jersey, dated May 17, 1955 and recorded May 18, 1955 in Deed Book 1750, page 216 in the Atlantic County Clerk's Office.



# WESTCOR
## LAND TITLE INSURANCE COMPANY

## SCHEDULE D
## LEGAL DESCRIPTION

Issuing Office File No. S-43586

ALL that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Atlantic City, in the County of Atlantic, State of NJ:

BEGINNING in the Southeasterly line of Ontario Avenue (50 feet wide) at a point 175 feet Southwestwardly of the Southwesterly line of Indiana Avenue (70 feet wide) and extending; thence

(1) South 27 degrees 40 minutes 5 seconds East, parallel with Indiana Avenue, 100 feet; thence

(2) South 62 degrees 19 minutes 55 seconds West, parallel with Ontario Avenue, 50 feet; thence

(3) North 27 degrees 40 minutes 5 seconds West, parallel with Indiana Avenue, 100 feet to the first mentioned Southeasterly line of Ontario Avenue; thence

(4) North 62 degrees 19 minutes 55 seconds East, along same, 56 feet to the point and place of BEGINNING.

Note for Information Only:
Also known as Lot(s) 3 Block 656, on the official tax map of Atlantic City, County of Atlantic, in the State of New Jersey.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Westcor Land Title Insurance Company . This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

# WESTCOR
## LAND TITLE INSURANCE COMPANY

**SCHEDULE C**
**LEGAL DESCRIPTION**

Issuing Office File No. S-43586-1

ALL that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Atlantic City, in the County of Atlantic, State of NJ:

BEGINNING 865 feet South from Pacific Avenue and 195 feet Eastwardly from Kentucky Avenue, being in the Easterly line of Westminster Avenue; thence

South, along the Easterly line of Westminster Avenue, 25 feet in front or width to the Northerly line of Westminster Avenue where same turns and runs East to New York Avenue and extending at right angles of Westminster Avenue between parallel lines 50 feet.

Note for Information Only:
Also known as Lot(s) 44 Block 51, on the official tax map of Atlantic City, County of Atlantic, in the State of New Jersey.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Westcor Land Title Insurance Company . This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

# EXHIBIT B

**CASH FLOW PROJECTION**

**James Candy Company**

In re _____

Debtor

Case No _____

## CASH FLOW PROJECTIONS FOR THE 14 MONTH PERIOD: November 1, 2018 through December 31, 2019

| | Month Nov-18 | Month Dec-18 | Month Jan-19 | Month Feb-19 | Month Mar-19 | Month Apr-19 | Month May-19 | Month Jun-19 | Month Jul-19 | Month Aug-19 | Month Sep-19 | Month Oct-19 | Month Nov-19 | Month Dec-19 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash beginning of the Month | 130,000 | 96,011 | 332,003 | 219,561 | 199,393 | 222,013 | 138,705 | 81,338 | 79,101 | 344,614 | 506,935 | 521,410 | 428,397 | 346,959 | |
| **RECEIPTS** | | | | | | | | | | | | | | | |
| Cash Sales | 277,832 | 549,813 | 107,910 | 190,231 | 263,045 | 178,595 | 301,906 | 510,789 | 773,827 | 821,537 | 443,646 | 260,358 | 268,116 | 545,337 | 5,492,920 |
| Accounts Receivable | 15,000 | 15,000 | - | - | - | - | - | - | - | - | - | - | - | - | 30,000 |
| Loans and Advances | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales of Assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest and Rental Income | 7,079 | 4,075 | 2,071 | 2,067 | 4,563 | 5,559 | 5,554 | 7,050 | 10,046 | 12,542 | 9,086 | 7,083 | 7,079 | 4,075 | 87,929 |
| **TOTAL RECEIPTS** | 299,911 | 568,888 | 109,981 | 192,280 | 267,607 | 184,154 | 307,460 | 517,839 | 783,873 | 834,079 | 452,732 | 267,441 | 275,195 | 549,412 | 5,610,849 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | | |
| Net Payroll | 129,473 | 129,045 | 69,455 | 67,959 | 89,943 | 96,453 | 120,583 | 158,138 | 100,532 | 254,443 | 121,099 | 113,171 | 123,132 | 127,948 | 1,701,374 |
| Hospitalization | 4,379 | 4,412 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 4,350 | 60,991 |
| Payroll Taxes | 14,774 | 13,567 | 10,448 | 10,463 | 14,201 | 12,866 | 15,535 | 19,288 | 14,675 | 31,954 | 18,344 | 14,502 | 15,878 | 16,002 | 222,517 |
| Operations | 48,944 | 65,789 | 27,781 | 31,875 | 35,991 | 29,575 | 33,895 | 50,811 | 52,533 | 51,111 | 41,778 | 38,778 | 43,175 | 52,496 | 602,511 |
| Sales, Use, and Other Taxes | 8,359 | 8,224 | 8,183 | 7,982 | 7,959 | 7,921 | 8,345 | 8,177 | 6,621 | 8,342 | 8,460 | 8,462 | 8,483 | 8,511 | 116,049 |
| Inventory Purchases | 64,289 | 51,639 | 24,405 | 24,916 | 25,977 | 45,722 | 103,707 | 182,785 | 196,920 | 180,338 | 129,887 | 96,015 | 92,942 | 128,082 | 1,347,626 |
| Secured / Rental / Leases | 37,864 | 36,053 | 48,065 | 39,652 | 40,576 | 42,466 | 45,255 | 63,844 | 98,533 | 105,104 | 82,918 | 51,829 | 36,785 | 35,185 | 764,131 |
| Insurance | 8,066 | 8,362 | 8,299 | 8,371 | 8,601 | 7,930 | 8,094 | 8,740 | 7,975 | 9,953 | 8,143 | 7,864 | 8,777 | 9,189 | 118,364 |
| Administrative & Selling | 13,976 | 13,024 | 13,895 | 13,936 | 14,347 | 14,617 | 15,021 | 15,900 | 21,679 | 18,121 | 15,236 | 14,921 | 15,068 | 15,260 | 214,931 |
| Rental Property Expense | 1,175 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 14,175 |
| Professional Fees | 2,600 | 1,800 | 2,042 | 2,042 | 2,042 | 2,042 | 7,042 | 7,042 | 7,042 | 7,042 | 7,042 | 7,042 | 7,042 | 7,042 | 66,904 |
| U.S Trustee Fees | - | - | 4,500 | - | - | 4,500 | - | - | 4,500 | - | - | 4,500 | - | - | 18,000 |
| Court Costs | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL DISBURSEMENTS** | 333,909 | 332,895 | 222,423 | 212,448 | 244,987 | 269,462 | 352,827 | 520,075 | 518,360 | 671,758 | 438,257 | 360,454 | 356,632 | 405,064 | 5,249,542 |
| **NET CASH FLOW** (Receipts less Disbursements) | (33,939) | 235,993 | (112,442) | (20,168) | 22,620 | (85,308) | (55,367) | (2,236) | 265,513 | 162,321 | 14,474 | (93,013) | (81,437) | 144,347 | 351,307 |
| **Cash End of Month** | 96,011 | 332,003 | 219,561 | 199,393 | 222,013 | 138,705 | 81,338 | 79,101 | 344,614 | 506,935 | 521,410 | 428,397 | 346,959 | 491,307 | |